May it please the Court, I'm Chelsea Ailey-Nelson. I'm here on behalf of Petitioners Ambrosie and Bjorka Beres. Although the immigration judge here offered a number of reasons for denying Mr. Beres's application for asylum, there's only one that we think is worthy of discussion today, and that's the issue of nexus. I couldn't hear your last word. Nexus is the issue that we think is most appropriately discussed in today's oral argument. Without a doubt, the two most important incidents underlying Mr. Beres's claim of past persecution are his two encounters with police. Oh, you mean the nexus between the incident? No, I guess I don't understand. I'm sorry. I thought the issue was really whether the harassment, rudeness, and perhaps discrimination rose to the level of persecution, and whether what he had to fear when he went back was persecution as distinguished from rudeness, harassment, and discrimination. And you're offering that it was a treatment by the police that makes it rise above that. No, our argument or my point here is that the immigration judge did make a decision that the lifetime of harassment, discrimination, abuse did not rise to the level of past persecution in Mr. Beres's, but we think that that was clearly counter to the law of the circuit. I don't understand why. Let me tell you my understanding of the record, and then you educate me because you know the record better than I do. He gets called names all the time. He gets called gypsy in a denigrating way. Well, that may be evidence that other conduct is persecution if the other conduct rises to the level of persecution, and that it's motivated by his ethnicity, but by itself it isn't persecution. In fact, those of us who grew up in the 50s, I would guess no matter what ethnic group we were in, got called names with nasty references to our ethnicity. Then you've got the soccer game. Rocks are thrown from his section of the stands. The cops bring the guys from that section of the stands into a room at the soccer stadium, and they holler at him and yell at him for a while, and then when the soccer game is over, they let him go. Was it the testimony that they were beaten? Yes, in the incident that the judge is just referencing, they were beaten. Tell me what the nature of the beating was. In that instance, they were pulled. They were visually pulled out of the crowd and brought to a separate area. One of the officers stood guard while another was beating sort of intermittently Mr. Barish and a few of his other friends. They weren't asked any questions. What kind of beating? I mean, they're bullies probably who join the police in every country in the world. That's correct. What is the nature of the beating? They were beaten with police batons that ultimately, so brutally, that it ultimately left Mr. Barish immobile and disoriented. Certainly excessive if the crime that they were supposedly investigating at that time that rocks had been thrown on the soccer field and hadn't actually injured or made contact with anyone. But my point on the nexus issue in this case, the judge did make a finding that the incidence of acts against Mr. Barish did not rise to the level of past persecution. However, we think that she, contrary to the law of the circuit, did not assess all of the acts presented by Mr. Barish in the aggregate. She was required to assess them cumulatively to determine whether or not they rose to the level of past persecution. So while there are instances of discrimination and harassment, there are numerous instances of physical beatings throughout Mr. Barish's life. But the two most significant incidents, we believe, and the central, the heart of Mr. Barish's claim are his two encounters with Romanian authorities. And in that case, the immigration judge gave no weight to either of those incidents except to note at page 106 of the record that Mr. Barish was, quote, briefly detained twice because of investigation of criminal activities. But Judge Kleinfeld asked, what did they do more after that soccer game? And as I read the record, the police ordered the men to remove their shirts and proceeded to beat them with their batons and kick them. Is that correct? That's correct, Your Honor. That was more than just discriminating against them or assuming they threw the stones because they were gypsies, but... Absolutely. And we believe that... Isn't that important to your case? It is important. And that incident, along with the second encounter that Mr. Barish had with Romanian authorities, we think are central to his claim because the heart of his claim, which the immigration judge entirely discounted, is that these encounters with police were pretextual in nature. They weren't investigational. How do we know the soccer game is pretextual because he's a gypsy and not because rocks are being thrown from that part of the stands? You made the observation the rocks didn't hit anyone, but I didn't get why that was important. If you have a soccer player out there, he'd rather not have rocks thrown at him whether they hit him or miss him. Well, because, again, the simple encounter at the soccer field with authorities cannot be viewed in isolation. It has to be viewed in the context. In a case like this where Mr. Barish makes a claim of pretextual harassment by the authorities that it's pretextual on the basis of his ethnicity, we have to look at the background contributions. How do we... Well, I think it's pretty well established that in Romania, as in much of Europe, there's discrimination against gypsies. They seem to have problems over history getting along with a lot of their ethnic groups. That's correct. But how do we know that the soccer game was because they were gypsies and not because of rocks from their area of the stands? Because, again, that incident has to be viewed in context, not only with that substantial evidence and background in Romania that gypsies are harassed on the basis of their ethnicity, but it also has to be viewed in context with the pattern of abuse and harassment that Mr. Barish made, also in conjunction with the fact that there was... There's no evidence in the record to suggest that at that time of the soccer game... Wait, you're saying that we should think that the cops pulled him and his friends out of the stands, not because of rocks, but because they were gypsies, because when he was a kid in school, the other kids called him gypsy? No, Your Honor. That's not my point. My point is that there is some evidence in that background documentation that Romanian authorities do function in a protectual manner against gypsies and Cungau, which is the ethnic minority that Mr. Barish is. And I'll quote at page 576 of the record that Cungau are objects of continuous harassment, including politically motivated lawsuits, that ethnic minorities like Mr. Barish have been, quote, scapegoated by public officials, including police. So there is some evidence in the record to show that that pattern exists with... About the incident at work in 1999, where the policeman said, come over here, you gypsy, you took the metal pieces. Then they hit him in the chin and nose and tried to make him write a confession. A second officer hit Barish on the thigh with his boot and squeezed his neck with his hands. He was kept in the room for three and a half hours and then moved to a basement cell and left overnight. I think you have a strong case when Judge Kleinfeld asked, did they beat him? They did beat him. They did beat him, and they made clear their motivation was his ethnicity in that particular instance. But his encounters with the authorities, I think these two have to be viewed together and, again, as part of this larger pattern of abuse and harassment on the basis of his government and authorities. So... Are you making the case that any gypsy from Romania is entitled to asylum, or are you making a case that this individual has a well-founded fear? We're not making the case that every gypsy would have this claim. The point that we're making is that Mr. Barish's claim was that he was the object of pretextual harassment, and in this case, the evidence supports that. And the immigration judge here completely ignored that evidence in rendering her decision, and she discounted these two incidents with the Romanian authorities as just simple criminal investigations. In so doing, she committed legal error. Mr. Barish's lifetime of harassment is something, and the background conditions are things that she had to conclude. She had to consider in determining whether or not what he was presenting, all of the acts he was presenting, rose to the level of past persecution. What ultimately happened on the metal parts investigation, the stolen metal parts? Well, as the judge mentioned, he was beaten. They mentioned that he was an ethnic minority. Ultimately, no charges were brought against him, and he was released. But he was kept in a cell overnight. He was kept in a cell in the basement, and he was also... They also attempted to force a false confession from him that he had, in fact, stolen the metal pieces. I see that my time is about to run out. I'll just briefly address the due process argument. In regards to the due process argument, we believe that the board applied an incorrect standard in assessing prejudice in this case. Despite that, we'll withdraw the argument that there was prejudice in regards to exclusion of the expert's testimony. But in regards to the exclusion of his son's testimony, we believe that the immigration on the waiver of his right to confidentiality. There's just no legal authority either in the immigration statute or in federal regulations to support that. And I see that my time is up. Thank you, counsel. May it please the court. My name is Lindsay Williams, and I represent the respondent in this case. Today, we respectfully request that the court affirm the decision of the Board of Immigration Appeals for the following reasons. The main issues that I think the court has outlined today that are before the court today are, first, whether or not the experiences that Mr. Berra has had in Romania rise to the level of persecution. Second, whether or not those encounters were on account of his ethnicity, the fact that he is a Tsingtao or ethnic Gypsy. I mean, Hungarian Gypsy, right? Right, correct. There's a third issue here, is there not, about the Convention Against Torture claim, where, on the one hand, the IJCPG states there is insufficient evidence to show that the respondent has ever been a victim of past torture, albeit he would be tortured by the Romanian government. What could he mean by that? I realize that's the third issue and not the first two you talked about. That's the one that bothered me. Correct, Your Honor. If I could just grab something off the table so that I could look at what you're looking at. It's the AR-108. You know, do you remember it? No, Your Honor. I don't remember the exact. I mean, I remember the Convention Against Torture. Administrative Record 108. Okay. G.I.J. said he'd be tortured if he returned. He said, albeit. In context, I thought he must have meant or that, but that's not what the record says. It doesn't say or that. It says albeit. Your Honor, if I were to answer that question, I would be speculating because I agree it doesn't seem to make sense and it seems that something must be missing. Wouldn't we have to remand? Do we get a clarification of that statement? No, Your Honor, because at no point did Mr. Beres allege that he would be tortured. Wait a minute. G.I.J. found, if the record is correct and correctly transcribed, that he'd be tortured if he sent back. That finding necessitates cat relief. So I don't see how you can justify not remanding on the cat relief, at least for clarification. Cat doesn't require nexus, right? No, Your Honor. Cat requires that the respondent would more likely than not be tortured where he returned to his country. This isn't more like it. So they would be. I.J. said he wouldn't be. Um, let me address this quickly because I don't I don't want to spend all our time on it. Let me. I'm prepared on it. Just say so. Move on other things. No, Your Honor. I have to say it wasn't briefed in the it wasn't pointed out in the briefs and I didn't write the brief. And in reading that sentence, it's a confusing sentence. I assume on that long airplane ride, you do the same thing as me. You read all this stuff. Correct. And your Honor was more observant than the respondent in this case. Let me look at the board's decision here. Let me ask you about something you know about. Let me ask you about something you know about because I know this is going to come up. We have two beatings and we have some remarks about him being a gypsy. Why doesn't that show a well-founded fear of persecution that the government will engage in as opposed to preventing because he's a gypsy. Cops will arrest him for no good reason and beat him up. Going only to the well-founded fear factor. That's right. Okay. Well, in looking at the two instances where he was detained by the police, only in one of those instances was any comment made whatsoever towards his ethnicity. And that was in 1999 when the police officer said, hey, gypsy, come over here. We have some questions to ask you. Now, one could argue that that's similar to saying, hey, blonde-haired girl or hey, white man, come over here. We have some questions to ask you. Other than that, throughout the entire interrogation, as far as the record is concerned, his asylum application and the summary of testimony that the IJ gave and that Mr. Vera signed off on, there is no indication that there was any other mention whatsoever of his ethnicity. How would we verify what you just said? Which part, Your Honor? That the record, that there's no evidence in the record? There is no record. There is no transcript from Mr. Beres' testimony. However, Your Honor, the immigration judge in the record, what is on the transcript, gave both parties every opportunity to challenge his summary or her summary of the testimony that was given by Mr. Beres and said, if there is any reason, Mr. Beres, that you think you need to offer your testimony again, re-testify, tell me now so that we don't have issues with this later. Whose obligation is it to keep and maintain a transcript? It is the immigration judge. It's the government. Right. The government. Yes, Your Honor. And what's the consequence of a failure to do that? Well, it depends on the circumstance, Your Honor. I would completely understand Your Honor's point if this was a situation where there was no transcript to be found anywhere and there was no summary and there was no agreement or if the immigration judge had not given Mr. Beres an opportunity to re-testify. However, in this case, Mr. Beres was given an opportunity to re-testify. He was given a chance, both parties were given a chance to listen to the immigration judge's summary of the testimony, and they both agreed to it. And he hasn't challenged it. In an ordinary appeal, for example, a civil appeal, if one party has the burden, the legal requirement to produce a transcript and they fail to do so, the law is quite clear. We assume that the production of the transcript would produce evidence contrary to that person's position. What's the consequence here? Well, Your Honor, in this particular case where, again, given all the facts that I've just cited and the fact that the petitioner has not challenged the lack of the transcript from his testimony and agreed to the immigration judge's summary, that there is no consequence. We work with the record that we have. He agreed to this record. He's not challenging it now. He's not alleging a due process violation. So we take what the immigration judge gave us, which is a summary, and along with his testimony. David. Yes, but this includes statements by the immigration judge? Is it she? Yes. Where she says the record shows this? The testimony shows this? There's no way to verify that? Well, the way to verify what she's saying to the petitioner is, this is what I remember. Do you want to disagree? Is that what she's basically saying? She said, this is what I remember from my detailed notes. You may retestify if you feel that it is necessary. He was represented by counsel. He still, to this day, has not challenged it. And there is no, I mean, there is no discrepancy between his affidavit that he submitted along with his asylum application and her summary. And she found that he was credible. Yes, and she found that he was credible, so that's not called into question. She had another option, maybe. Her other option being to allow him to retestify? No, to have another hearing. Well, yes, I mean, she could have had another hearing, yes. But she did everything that she could in the sense of saying to the parties, do you feel that this is necessary? Did she ever say why? Why she did not have another hearing. I would speculate from having read the transcript that it's because no one seemed to have a problem with her summary of the testimony. So, and again, if you read his asylum affidavit and the testimony as it was summarized by the immigration judge, there are no vast differences. And going to Petitioner's claim that the immigration judge didn't take into account Mr. Beres' childhood or his military hazing or difficulty finding a job, all of that is in the summary. So the fact that it's in the summary, we must assume that the immigration judge took it into account based on the fact that we assume that government officials do their duty in good faith. I have very little time left, so I'm going to try to hit some points here. Just basically, Mr. Beres had a tough childhood. Mr. Beres had some harassment and some discrimination growing up, but he finished secondary school. He went on to join the military. He went through some hazing in the military, but he made it through the military. He went on to get a job. From 1978 until 1997, the only encounter he had was occasionally at the bread line. People would call out gypsy. One time he was roughhoused by two individuals. But that's for 20 years. That is all that, the only encounter that he had. Then he has two instances with the police, both in conjunction with criminal investigations. And only one time was the fact that he was a gypsy brought up. We can look at Prasad, which is a case that was pointed to by the immigration judge, where we have an individual who was taken to a police station, placed in jail, hit in the stomach, and kicked from behind, detained for four to six hours, and interrogated about his political allegiances, and released. And this court found that the record did not compel a conclusion contrary to that of the board that this person had suffered past persecution. It was a short detainment. It was no medical treatment was required. Both of those in both instances here, that's the case we have. Both detained – both times he was detained was short. He never required any medical treatment. He never missed a day from work. He never lost his job. So he didn't – he didn't report it to the police. No, he didn't report it to the police, but that probably would not have been a requirement in this case, since the police were the ones that were responsible. If the board were to remand on the Catt claim, would the government or the immigration judge be bound by this statement, that he would be tortured? Well, first, to say, looking – looking to – I understand that this court is reviewing both the board's decision and the immigration judge's decision. The board did nothing with this. They just said, we agree. Well, they said that we agree that the Respondent failed to meet the burden of proof on the torture claim, and then they also talked to the – speak to the due process claim. I think that if the court were to remand, which, again, Respondent does not believe is necessary, because if there was no past persecution, then the likelihood of there being torture – Torture is a completely separate thing. I understand, Your Honor. And we're dealing with a record here where the I.J. has said that he would be tortured if returned. If the court feels that it's – if the court feels that that statement prevents it from affirming the decision of the board, then the answer would be to remand it to allow the board, to allow the immigration judge to clarify the statement. And how was she to clarify that? Your Honor, simply to state what she meant. Would she say, I didn't say that? Well, again, that would be speculation for me to say what the immigration judge would say, but she simply could read it and clarify whether there were words missing, whether there was some – How would she know she said it? Well, again, Your Honor, because we presume that government officials do their duty in good faith. That's not what I'm talking about. There's no transcript. I mean, it's one thing if you have a problem – I had a death penalty case years ago that dealt with exactly whether a judge in giving an instruction, a State trial judge, had said shall or may. And we had to go back and find the court reporter's notes and dig them out, and sure enough, the trial judge gave the proper instruction. But here – Well, her oral decision – I mean, that's what it is. It's an oral decision. That is what she said that day on the – there is a transcript. It says, albeit he would be tortured if he went back. Correct. So that is what she – those are the words that came out of her mouth. You don't want to – you don't even want a chance for her to file an affidavit saying that's not what I said. The court reporter must have made an error. You just assume if we think that's enough to require cat relief – No, Your Honor – I'll send it back for cat relief. No, Your Honor. I simply was addressing the question of how do we know if that's what she said that day. We know that's what she said that day because the transcript was being taken that day. Now, if there's a word missing, there are mistakes that are made in transcripts. Again, we don't feel it's necessary for the court to remand it on this issue. If the court feels it's necessary, then the proper course would be to allow the immigration judge to clarify it, which – how she would go about that would be her decision to make. Thank you, counsel. Thank you. I just got one quick question.  Can you explain this to me? No, Your Honor, I think albeit would not be the word that would need clarification. It would be something in the rest of the words that maybe a word is missing, maybe a word is out of order. I agree it's a confusing sentence. Thank you. Thank you, counsel. Beres v. Mukasey is submitted and we'll recess for the day.
judges: D.W. Nelson, Reinhardt, Bea